## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| LAMARR BETTS, and RENEE BETTS, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:18-cv-02923-TWP-TAB |
| | ) | |
| WAL-MART STORES INC., | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on a Motion for Summary Judgment filed pursuant to Federal Rule of Civil Procedure 56 by Defendant Wal-Mart Stores, Inc. ("Walmart") (Filing No. 136). Plaintiffs LaMarr Betts ("Mr. Betts") and Renee Betts ("Mrs. Betts") (collectively, "Plaintiffs") filed this lawsuit for premises liability negligence against Walmart after Mr. Betts suffered a traumatic work-related personal injury that occurred on March 15, 2017. Following discovery, Walmart filed its Motion for Summary Judgment on the Plaintiffs' claim, arguing that the evidence does not support a claim of negligence.  For the following reasons, the Court **grants** Walmart's Motion.

## I.        BACKGROUND

The following facts are not necessarily objectively true, but as required by Federal Rule of Civil Procedure 56, the facts are presented in the light most favorable to the Plaintiffs as the non-moving party. *See Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The events that give rise to this action occurred at a "Return Center" in Greenfield, Indiana (the "Greenfield Return Center"). At the time of the incident, the Greenfield Return Center was

owned by Harvest A. MCCP 104, LLC, and leased to Walmart Stores East, LP.   The commencement date of the lease was March 1, 2015, and the lease is scheduled to expire on May 31, 2030 (Filing No. 138-12; Filing No. 138-13; Filing No. 138-14 at 3).

The design of the layout of the Return Center was done by Intelligrated Systems, LLC ("Intelligrated") and Walmart, and Walmart contracted with Intelligrated to install the conveyor system at the Greenfield Return Center (Filing No. 168-4 at 1, 3, 11, 107, 123–25). The conveyor system has a fixed portion bolted into the ground as well as an extendable belt. This extendable belt is called a truck unloader and extends into a semi-trailer parked at the dock (Filing No. 168-3 at 1–5; Filing No. 168-4 at 107; Filing No. 138-4 at 11, 16).

The contract between Walmart and Intelligrated provided that Walmart was responsible for the installation of the protection for the conveyor system, including highway guarding (Filing No. 168-4 at 3, 123, 125, 131). Yellow highway guarding was placed on both sides of the conveyor system at issue (Filing No. 168-3 at 2–5). The yellow highway guarding at issue was installed at Walmart's direction and request (Filing No. 168-2 at 1). The yellow highway guarding was installed to protect both the conveyor system equipment and the people at the Greenfield Return Center (Filing No. 138-2 at 10–11). The end of the yellow highway guarding aligns with the end of the fixed portion of the conveyor system that does not extend out. When fully retracted, the extendable portion of the conveyor system sticks out beyond the end of the yellow highway guarding (Filing No. 138-4 at 11, 16; Filing No. 168-3 at 1–3). Extending the yellow highway guarding to the end of the extendable portion of the conveyor system in its fully retracted position would not have interfered with the operation of the Greenfield Return Center (Filing No. 138-4 at 16).

Walmart processes returned merchandise at the Greenfield Return Center. Walmart contracted with Exel/DHL ("DHL") to receive and process the returns for Walmart at the Greenfield Return Center. Walmart also directed how much product was received at the Greenfield Return Center (Filing No. 138-1 at 4–5; Filing No. 138-2 at 9, 12). The Greenfield Return Center was one of five return centers operated contractually by DHL at the time of the incident at issue (Filing No. 138-2 at 13). Under their contract, Walmart and DHL were independent contractor business entities, not partners or employer/employee (Filing No. 138-15 at 12). Pursuant to the contract, DHL was to operate the Greenfield Return Center for Walmart in accordance with the standards and specifications of Walmart. DHL was responsible for providing necessary management personnel and fully trained crews to operate the Greenfield Return Center. DHL was responsible for personnel safety matters and was required to operate the Greenfield Return Center in accordance with safety laws and regulations. *Id.* at 2–3.

The contract also stated, "[DHL] shall not make any material alterations to the Facility without Wal-Mart's prior written consent". *Id.* at 2. Furthermore,

> [DHL] shall at all times during the Term, keep and maintain the Facility in good condition and repair, ordinary wear and tear excepted, and in compliance with all federal, state and local laws, ordinances, codes, rules and regulations. At [DHL]'s sole cost and expense, [DHL] shall make repairs to the Facility that are caused by [DHL]'s failure to keep and maintain the Facility in good condition and repair . . . . At Wal-Mart's sole cost and expense, [DHL] shall make all alterations and improvements to the Return Center requested by Wal-Mart and shall install all equipment and fixtures requested by Wal-Mart.

*Id.* at 6.

DHL's General Manager, Jason Rowe, described the Greenfield Return Center as a "DHL facility." (Filing No. 138-2 at 10.) Walmart managed the disposition of returned merchandise through a remote warehouse manager system, but no Walmart employees were stationed in the Greenfield Return Center. Employees from Walmart came for periodic audits of regulated

3

materials or for facility visits. Walmart employees completed tours of the Greenfield Return Center approximately twice a year. Walmart did not audit DHL for safety-related measures, DHL did not have safety reporting requirements to Walmart, and it was not typical for DHL to report its employees' injuries to Walmart.  *Id.* at 9, 12–14; Filing No. 138-4 at 19.

DHL had safety policies and procedures manuals for the Greenfield Return Center as well as an employee handbook. DHL also had a safety manager—Bill Metcalfe—and a safety committee at the Greenfield Return Center. DHL also maintained quality training, maintenance, and operations departments at the Greenfield Return Center.  DHL also provided its employees at the Greenfield Return Center with new hire orientation and safety training, covering topics such as lock-out/tag-out, working in confined spaces, slip-and-fall, and avoiding building hazards. Employees at the Greenfield Return Center had monthly DHL safety meetings (Filing No. 138-4 at 3–4; Filing No. 138-2 at 7).

Mr. Betts was an employee of DHL, not Walmart, and he worked at the Greenfield Return Center (Filing No. 168-1 at 3, 5).  Mr. Betts began working for DHL in 2012 at a Walmart Return Center in Indianapolis, Indiana as an operations supervisor working the night shift.  During his time at the Indianapolis Return Center, he personally used a pallet rider, referred to as a walkie rider[1], approximately twice a month. Mr. Betts later transferred to the Greenfield Return Center where he worked for a few years before the incident at issue occurred (Filing No. 138-1 at 2–3, 22).

Mr. Betts was part of the DHL team to help set up the Greenfield Return Center.  He was familiar with the yellow highway guarding throughout the Greenfield Return Center. However,

---

[1] A walkie rider pallet truck is a heavy-duty, electric power lift truck that can be used as a walkie or rider truck for low-level order picking, loading, unloading and transporting. https://www.crown.com/en-us/forklifts/pallet-trucks/pe-end-controlled-rider-pallet-truck.html.

during his time at the Greenfield Return Center, he never paid attention to the fact that the extendable portion of the conveyor system stuck out beyond the yellow highway guarding positioned next to the fixed portion of the conveyor system. *Id.* at 2, 28, 31.

While working at the Greenfield Return Center, Mr. Betts received regular training and certification on how to maneuver walkie riders. Prior to the incident at issue, he was certified and recertified by DHL to operate a walkie rider. His training was through written tests, classroom settings, and hands-on tests during his tenure at both Return Centers. Recertification was provided by a "trainer" or shift manager. Mr. Betts was trained to drive cautiously, to keep a proper look out, and to look in the direction of his travel. He also was instructed that he could be pinned or crushed by an object protruding into the operator area of the walkie rider. The Greenfield Return Center was larger and busier than the Indianapolis Return Center where Mr. Betts initially had worked. As a result, Mr. Betts used a walkie rider to help his fellow employees more often than at the previous Return Center—about five to six times per week (Filing No. 138-1 at 5–7, 22–25; Filing No. 138-11).

On March 15, 2017, Mr. Betts was working at the Greenfield Return Center. That night, he had been working with another DHL employee to move product from the Return Center into a truck. At the time of his injury, Mr. Betts was riding on a walkie rider without any product on it. He was attempting to move out of the way of the other DHL employee. The two of them had been doing this same maneuver throughout the night. As he was traveling at a normal speed, Mr. Betts disengaged the ignition grip on the walkie rider expecting it to stop, but it continued to move or float. He then struck the extendable portion of the conveyor system. Mr. Betts did not see the conveyor system prior to striking it. The inside of his left leg got pinned between the extendable portion of the conveyor system and the walkie rider. This resulted in his left leg being lacerated

and his tibia and fibula being fractured.  While no one witnessed the incident as it occurred, coworkers came to Mr. Betts' aid, paramedics eventually arrived, and he was taken to the hospital (Filing No. 138-1 at 2, 8–10, 14–16, 18, 30; Filing No. 138-3; Filing No. 138-5; Filing No. 138-7; Filing No. 168-3 at 6). Mr. Betts' injury to his tibia and fibula eventually necessitated a below-the-knee amputation of his left leg (Filing No. 24 at 1).

DHL's general manager at the Greenfield Return Center was notified of the incident when he received a telephone call at his home in the middle of the night.  He later reviewed the incident with other managers.  Seeing surveillance video footage of the incident, DHL's general manager concluded that Mr. Betts was not looking in the direction of his travel at the time of his accident despite being trained to look in the direction of travel (Filing No. 138-2 at 5–6). DHL's safety manager visited Mr. Betts in the hospital that morning (Filing No. 138-1 at 18).  He recalls that, during his hospital visit, Mr. Betts stated that he drove into the conveyer system because he was not looking where he was going, and Mr. Betts did not say there were problems with the walkie rider (Filing No. 138-4 at 7). Mr. Betts later denied that he stated to the safety manager that he was not looking in the direction of his travel (Filing No. 168-1 at 6–7).

DHL's safety manager subsequently performed an investigation of the incident and concluded that the root cause of the incident was Mr. Betts' inattention to the conveyor system's location by looking in the opposite direction. The investigation report noted that Mr. Betts had been looking toward the pallet that he had just dropped off rather than in the direction of the conveyor system (Filing No. 138-6). The safety manager recalled that this information was communicated to him by Mr. Betts (Filing No. 138-4 at 10). DHL's internal summary of the incident, which was prepared by the safety manager, indicated that Mr. Betts misjudged his location and struck the edge of the conveyor system because he was not looking in the direction

of his travel. It also noted that no other similar incidents had ever occurred at the Greenfield Return Center (Filing No. 138-7).

In the year following this incident, the Greenfield Return Center transitioned from a DHL-operated facility to one run directly by Walmart.  DHL's operation of the Greenfield Return Center ceased on May 4, 2018 (Filing No. 138-1 at 32; Filing No. 138-2 at 6). During DHL's time at the facility, DHL's safety manager did not provide any recommendations to Walmart to extend the highway guarding beyond the extendable conveyor belt, and DHL's general manager never received any complaints regarding the conveyor system highway guarding at the Greenfield Return Center (Filing No. 138-4 at 17; Filing No. 138-2 at 10).

Mr. Betts initially filed his lawsuit in state court against Intelligrated Systems, LLC, and Crown Equipment Corporation (Filing No. 1-1). After the case was removed to federal court, he and his wife filed the Second Amended Complaint, (Filing No. 24), which adds Stewart-Glapat Corporation as a party, and includes a premises liability negligence claim against Walmart (Filing No. 24). Walmart filed the instant Motion for Summary Judgment on the claim against it on January 29, 2021 (Filing No. 136), and the claims against the other defendants were dismissed with prejudice by stipulation (Filing No. 170; Filing No. 172).

## II.      SUMMARY JUDGMENT STANDARD

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v.*

*Quotesmith.com, Inc.*, 476 F.3d 487, 489–90 (7th Cir. 2007). In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante*, 555 F.3d at 584 (citation omitted). "However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation and quotation marks omitted). Additionally, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "The opposing party cannot meet this burden with conclusory statements or speculation but only with appropriate citations to relevant admissible evidence." *Sink v. Knox County Hosp.*, 900 F. Supp. 1065, 1072 (S.D. Ind. 1995) (citations omitted).

"In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of [the] claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citations and quotation marks omitted). "[N]either the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and quotation marks omitted).

### III.    DISCUSSION

Walmart argues that it is entitled to summary judgment on Mr. Betts' premise liability negligence claim because it did not owe a duty to him, and, even if a duty existed, causation is lacking to support the claim. Walmart further argues that, because Mr. Betts' claim fails, Mrs. Betts' derivative loss of consortium claim also fails. In their response brief, the Plaintiffs raise

various objections to Walmart's summary judgment materials. The Court will first address these objections and then turn to the negligence claim.

## A. <u>Plaintiffs' Objections</u>

The Plaintiffs first object to Walmart's "Statement of Undisputed Facts," arguing that it does not comply with the Local Rules because it is more than twelve pages and includes disputed and undisputed facts as well as background facts that are not material to the Motion for Summary Judgment. The Plaintiffs argue the Court should not consider Walmart's "Statement of Undisputed Facts". Walmart responds that it supported each factual reference with a citation to designated evidence, and it disagrees about the relevance of the facts included in the section; all the factual statements in Walmart's brief are material to understanding the case and the reasoning behind the Motion for Summary Judgment. Walmart's position is well-taken, and the Court will consider its "Statement of Undisputed Facts" when deciding the Motion.

The Plaintiffs next object to Walmart's "Exhibit O – Amended Restated Master Operating Agreement". (Filing No. 167 at 4-5.)  Walmart points to Exhibit O for its assertion that DHL and Walmart had a contractual relationship that required DHL to operate the Greenfield Return Center. The Plaintiffs argue that Exhibit O is not a contract to operate the Greenfield Return Center but rather Return Centers in Indianapolis, Las Vegas, Nevada, Johnstown, New York, and Spartanburg, South Carolina. The contract refers to Walmart and Exel, and Mr. Betts acknowledges that Exel became DHL. Thus, the Plaintiffs argue, Exhibit O is not relevant to this case involving the Greenfield Return Center. Walmart responds that the Plaintiffs have not provided any contrary evidence regarding the relationship between DHL and Walmart regarding the operation of the Greenfield Return Center. Walmart contends that Exhibit O is representative of Walmart's contractual agreement with DHL, and importantly, there is no dispute regarding the

fact that DHL was the independent contractor operating the Greenfield Return Center where Mr. Betts worked.  Again, Walmart's position is well-taken, and the Court will consider Exhibit O when deciding the Motion.  Evidence concerning the contractual relationship between Walmart and DHL is relevant, Mr. Betts acknowledged that Exel became DHL, and Exhibit O is representative of the contract governing the Greenfield Return Center (the Plaintiffs have not rebutted this). Additionally, the Plaintiffs relied on Exhibit O in their response brief to support their factual assertions.

Next, the Plaintiffs object to Walmart's "Exhibit H – Crown Inspection Document" because it is hearsay. *Id*. at 6-7. There is no supporting affidavit from anyone that this was a record of regularly conducted business activity.  Rather, the Plaintiffs argue, Walmart attempts to get around the hearsay issues by referencing the testimony of a DHL employee who stated he did not receive the report and did not retain the paperwork. Moreover, the "Crown Inspection Document" was completed two months after Mr. Betts' injury and is based on information from yet another DHL employee, not a Crown employee, thereby making it double hearsay. Walmart responds that the deposition testimony of Mr. Betts' fellow DHL employee supports the use and reference of this document as that DHL employee testified that he saw this document from Crown. Walmart's response does not address the hearsay objection raised by the Plaintiffs; therefore, the Court will sustain the objection and not consider Exhibit H when deciding the summary judgment Motion.

Finally, the Plaintiffs object to Walmart's "Exhibit Q – Report of Farheen Khan, Ph.D." *Id*. at 7.  They assert that Walmart's Exhibit Q is the unsigned, unsworn, and unauthenticated report of its expert, and thus, it is not admissible evidence. They ask the Court to not consider the expert report for purposes of deciding the Motion for Summary Judgment.  Walmart responds that Exhibit Q is the same report that Walmart produced in its expert disclosure, and the Plaintiffs asked for an

extension of time to file their response brief for the specific purpose of deposing Dr. Farheen Khan regarding her report. This requested deposition took place, during which Dr. Khan was repeatedly questioned about the report and her opinions contained therein. Walmart argues that the Plaintiffs are fully aware that Exhibit Q is authentic, and the objection should be overruled. The Plaintiffs' position is well-taken. An unsigned, unsworn, unauthenticated expert report is not admissible at the summary judgment stage.  *Scott v. Edinburg*, 346 F.3d 752, 759 (7th Cir. 2003); *Est. of Williams v. Indiana State Police*, 26 F. Supp. 3d 824, 837 (S.D. Ind. 2014). Even if Walmart is correct in its assertion that the *Plaintiffs* are aware that Exhibit Q is authentic, the designated evidence before the *Court* fails to authenticate Exhibit Q and make it admissible. Therefore, the Court sustains the Plaintiffs' objection to Exhibit Q and will not consider it for summary judgment purposes.

## B.    Negligence Claim

Walmart argues that it is entitled to summary judgment on the negligence claim because it did not owe a duty to Mr. Betts, and causation is lacking to support the claim.

> To recover in negligence, a plaintiff must establish: (1) a duty on the part of the defendant to conform his conduct to a standard of care arising from his relationship with the plaintiff; (2) a failure on the part of the defendant to conform his conduct to the requisite standard of care; and (3) an injury to the plaintiff proximately caused by the breach.

*Schlotman v. Taza Cafe*, 868 N.E.2d 518, 521 (Ind. Ct. App. 2007).

Under Indiana law, "[g]enerally, the owner of property is under no duty to provide an independent contractor with a safe place to work, although there is a duty, which extends to employees of independent contractors, to keep the premises in a reasonably safe condition." *Bethlehem Steel Corp. v. Lohman*, 661 N.E.2d 554, 556 (Ind. Ct. App. 1995) (internal citations omitted). Walmart argues that this duty related to a premises' general conditions does not require

that an owner provide a safe place to work for business invitees such as employees of an independent contractor. *Bateman v. Central Foundry Div., GM Corp.*, 822 F. Supp. 556, 563 (S.D. Ind. 1992).  Relying on *Douglass v. Irvin*, 549 N.E.2d 368 (Ind. 1990), Walmart notes,

> A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land, but only if, he (a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and (b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and (c) fails to exercise reasonable care to protect them against the danger.

*Id.* at 370 (internal citation omitted). The duty applies even when the knowledge of the owner about the dangerous condition on its premises is not superior to that of the invitee. *Id.* Walmart argues that if the landowner, as here, has no actual or constructive knowledge of any danger, there is no duty to warn of the danger. *Wingett v. Teledyne Indus., Inc.*, 479 N.E.2d 51, 54–55 (Ind. 1985).

Walmart argues that it did not exercise control or possession over the premises at the time of Mr. Betts' accident, and thus, it cannot owe a duty to him.  Because Walmart did not have control of the premises, it was not in a position to remedy any hazards that were present on the land. At the time of Mr. Betts' accident, DHL was in possession and control of the Greenfield Return Center.  Similarly, Walmart asserts, control is determinative when an injury claim arises from an instrumentality on the premises.  To establish liability of a landowner for an instrumentality on the premises, the owner must have assumed control over an instrumentality in control of an independent contractor. *Bethlehem Steel*, 661 N.E.2d at 557. Walmart argues that DHL alone exercised control over the equipment involved in Mr. Betts' accident—the walkie rider and the conveyor with its extender.  And Walmart did not share in control of the premises or the equipment.

Walmart contends that DHL, by virtue of its contractual duties under its agreement with Walmart, was the "possessor" of the Greenfield Return Center at the time of the incident, with the

ability to remedy hazards on the premises, report issues in its operation, and control the safety of its personnel on the premises. DHL was an independent contractor, and Mr. Betts was a DHL employee. DHL alone exercised control over the area where Mr. Betts was injured and oversaw safety in the area as it enforced its own safety rules on the premises.

Furthermore, Walmart asserts, management of the facility was directed by DHL employees, and no Walmart employees were stationed at the facility. Training at the facility, including training on the use of walkie riders, was provided by DHL, not Walmart. Possession and control over the Greenfield Return Center was not returned to Walmart until more than a year after Mr. Betts' accident. Similarly, DHL controlled the walkie riders at the facility as it maintained and repaired the walkie riders, and it provided training to its employees about the use of walkie riders.

Walmart also argues,

> In the alternative, Plaintiffs' premises liability claim similarly fails because the conveyor guarding was a known and/or obvious condition to Mr. Betts and Walmart had no notice of any danger posed by the guarding not covering the conveyors' adjustable extension end. Indiana law does not hold a premises owner, occupier, or possessor liable for conditions that are known or obvious to an injured party. "An invitor is not the insurer of the invitee's safety, and before liability may be imposed on the invitor, it must have actual or constructive knowledge of the danger." *Johnson v. Blue Chip Casino, LLC*, 110 N.E.3d 375, 378 (Ind. Ct. App. 2018) (quoting *Schultz v. Kroger Co.*, 963 N.E.2d 1141, 1144 (Ind. Ct. App. 2012)).

([Filing No. 137 at 20](#).)

In this case, Walmart contends, it had neither actual nor constructive notice that not guarding the conveyor equipment to its very end posed a danger that would be undiscoverable by DHL's walkie rider operators at the Greenfield Return Center.  DHL, as the operator physically present at the Greenfield Return Center, was unaware of any safety risks posed by the placement of the conveyor's guarding. No DHL representatives ever received any complaints regarding the conveyor's guarding.  No evidence suggests that any complaints regarding the conveyor's guarding

13

were communicated to Walmart.  And according to DHL, there were no similar incidents involving the area where Mr. Betts sustained his injury.  No such injuries were communicated to Walmart.

Walmart asserts the conditions alleged by Mr. Betts as contributing to his injuries—the partially unguarded extendable conveyor and the open-sided walkie rider—were known to Mr. Betts and obvious to a reasonable person in his trained, supervisory position. Mr. Betts denied noticing the conveyor and its guarding in his years working at the Greenfield Return Center, but he was familiar with the similar set-up throughout the building, and he operated a walkie rider at the Greenfield Return Center five to six times per week and had years of experience operating walkie riders. Mr. Betts was specifically informed and knew of the danger of getting pinned or crushed on a walkie rider in areas where surrounding objects could protrude into the operator area. Walmart concludes that it did not owe a duty to Mr. Betts as an employee of an independent contractor on the basis of control over the premises and instrumentality and, alternatively, on the basis of Walmart's lack of notice of the conditions and the known and obviousness of the conditions on the part of Mr. Betts.

In response, the Plaintiffs first note that "whether a duty exists is a question of law for the court to decide." *Rogers v. Martin*, 63 N.E.3d 316, 321 (Ind. 2016). "But a judicial determination of the existence of a duty is unnecessary where the element of duty has already been declared or otherwise articulated." *Id.* (internal citation and quotation marks omitted). "[T]he duty to exercise reasonable care for an invitee's protection while the invitee is on the premises is already firmly grounded in [Indiana's] premises liability law." *Id.* "Generally, an owner of property is under no duty to provide an independent contractor with a safe place to work." *Pelak v. Indiana Indus. Servs., Inc.*, 831 N.E.2d 765, 769 (Ind. Ct. App. 2005). "However, the owner has a duty to maintain

the property in a reasonably safe condition for business invitees, including employees of independent contractors." *Id.*

The Plaintiffs note that, in premises liability cases, whether a duty is owed depends primarily upon whether the defendant was in control of the premises when the accident occurred. *Rhodes v. Wright*, 805 N.E.2d 382, 385 (Ind. 2004). They assert that actual physical possession of property at the precise moment an accident happens is not always dispositive on the question of control for premises liability purposes if there is evidence that another party was in a better position to prevent the harm that occurred. *See Yates v. Johnson Cty. Bd. of Comm'rs*, 888 N.E.2d 842, 848 (Ind. Ct. App. 2008); *Rhodes*, 805 N.E.2d at 386; *Beta Steel v. Rust*, 830 N.E.2d 62, 71 (Ind. Ct. App. 2005); *see also Walker v. Ellis*, 126 Ind. App. 353, 129 N.E.2d 65, 73–74 (1955).

The Plaintiffs argue that Walmart alone had control over the condition on the land at issue and was in a better position to prevent the harm that occurred. Walmart leased the Return Center, and the yellow highway guarding at issue was installed at Walmart's direction and request. Only Walmart and Intelligrated were involved in determining the layout of the conveyor system at the Greenfield Return Center, and Walmart had the responsibility for the installation of conveyor protection, including the yellow highway guarding at issue. DHL was responsible for processing Walmart's returns; it was not responsible for determining the location of protective barriers.

The Plaintiffs argue Walmart erroneously relies on *Bethlehem Steel* for its contention that it did not have the requisite control of the premises to impose a duty on it. The Plaintiffs assert that the injuring instrumentality here involves the yellow highway guarding, which was not in the control of Mr. Betts or DHL.  It was in the control of Walmart.  The designated evidence supports a finding that Walmart was in a better position to prevent the harm that occurred.  Therefore, the application of the appropriate Indiana case law imposes a duty on Walmart since it was in the best

position to remedy the deficient condition of the yellow highway guarding that it installed and maintained.

Regarding injury resulting from a condition on the land, the Plaintiffs argue that the unguarded corner of the extendable portion of the conveyor system created an unreasonable risk of harm. The highway guarding is commonly used in facilities like the Greenfield Return Center, and DHL acknowledged that the highway guarding was in place to protect the equipment and also to protect people from running into the conveyor system. The designated evidence shows that the yellow highway guarding had been struck multiple times, and it is more likely than not that Mr. Betts would not have been injured if the guarding was extended to the end of the extendable portion of the conveyor system. Thus, leaving it unguarded created an unreasonable risk of harm.

The Plaintiffs contend Walmart had knowledge or constructive knowledge of the unreasonable risk of harm because the yellow highway guarding was installed at its request and direction, and if it did not know of the risk, it would not have installed the guarding in the first place. Walmart had determined that yellow highway guarding was necessary and had determined where to install it. Walmart guarded the fixed portion of the conveyor system but not the extendable portion of the conveyor system, and a short extension of the guarding to the end of the extendable portion would not have interfered with the operation of the Greenfield Return Center. The hazardous condition existed for years and would have been discovered by Walmart if it had used ordinary care. The Plaintiffs assert that the condition was not known to Mr. Betts.  Prior to his injury, Mr. Betts never noticed that the fully retracted belt on the conveyor system stuck out further than the yellow highway guarding, and he also did not see the conveyor system prior to striking it.  Walmart should have expected that Mr. Betts would have been oblivious to the danger

or failed to protect himself from it. By installing the guarding, Walmart knew the risk of running into the equipment and that people would fail to protect themselves against the risk.

In reply, Walmart notes that both Walmart and the Plaintiffs agree that in order for a duty to be imposed on Walmart, it must have had control of the premises and its instrumentalities. The Plaintiffs argue in their response brief that Walmart had control of the property and the condition of the land on which Mr. Betts' injury occurred, relying on *Yates* and *Rhodes*. Walmart argues that those cases are easily distinguishable from this case. In *Yates*, the landowner had admitted in discovery that it controlled the entire property, including the stairway where the injury occurred, and the landowner was responsible for maintaining the stairs. *Yates*, 888 N.E.2d at 846–48.

In *Rhodes*, the landowner argued that, at the time of the incident, the independent contractor's employees had arrived at and had taken control of the property, and thus, the independent contractor controlled the land at the time of the accident, and only the independent contractor could be held responsible for harm to its employees. However, the court determined that the landowner owned the area where the incident occurred, was responsible for maintaining that area, determined who could enter the property and when, and knew the independent contractor's employees would be there at that particular time. The landowner also was required by the contract to be present, and the landowner always controlled the external lighting in the area where the incident occurred. Thus, the court concluded, there was an issue of fact whether the landowner maintained control over the premises. *Rhodes*, 805 N.E.2d at 384–87.

Walmart asserts,

*Yates* and [*Rhodes*] are, as demonstrated by the above, distinguishable from this case at bar. Both *Yates* and [*Rhodes*] involved lawsuits brought against the owners of the property, while Walmart here is a lessee, not an owner. Both *Yates* and [*Rhodes*] involved instances where the owners had temporarily surrendered control of their premises for only a short, temporary, duration of time during which the accidents in question occurred: in *Yates* for the limited time the circus occupied the

> land and in [*Rhodes*] for the limited time when the Tyson employees were on the
> farm collecting chickens. Finally, in both *Yates* and [*Rhodes*], it was undisputed
> that the landowners otherwise controlled the premises and the involved
> instrumentalities and were responsible for their maintenance when the third parties
> were not present.

([Filing No. 169 at 6](#).) However, in this case, Mr. Betts' employer DHL, not Walmart, was in control

and possession of the Greenfield Return Center, including the area where Mr. Betts was injured.

DHL directed the daily operations, including Mr. Betts' work, and DHL could remedy any hazards

at the facility. DHL had the sole authority to operate the facility, was an independent contractor,

and oversaw the safety on the premises. Management of the facility was directed by DHL

employees, and it was considered a DHL facility. No Walmart employees were stationed at the

facility, and they would appear only occasionally. DHL provided training at the facility, including

safety training. Possession and control of the facility was not turned over from DHL to Walmart

until more than a year after Mr. Betts' accident.

Walmart argues that it is immaterial who initially installed the yellow highway guarding

because DHL occupied and controlled the premises prior to and at the time of the incident, DHL

was responsible for its operations, and DHL was in the best position to remedy any allegedly

dangerous conditions located on the premises. As such, Walmart did not owe a duty to Mr. Betts

under applicable Indiana law as DHL was the possessor in control.

Furthermore, Walmart argues it did not have actual or constructive knowledge of the

danger because Walmart and DHL never received complaints about the conveyor system, and there

were no other similar incidents with the conveyor system. No complaints or incidents were

communicated to Walmart. Walmart did not occupy the facility; DHL did. And Walmart relied on

DHL who was present at the facility to notify Walmart of any concerns, but no concerns were

raised with Walmart. Additionally, Walmart argues it could not have been expected that Mr. Betts

would not discover the alleged danger as he worked daily around the extendable conveyor system and the walkie riders. He worked there many years and rode walkie riders five to six times a week. He was an operations supervisor and helped set up the Greenfield Return Center. He was involved in numerous safety trainings, and he was specifically instructed by DHL about the danger of getting pinned or crushed on a walkie rider in areas where surrounding objects could protrude into the operator area.

> In its reply brief, Walmart concludes,
>
> A DHL trained, supervisory employee, exercising ordinary perception could observe the presence of the extendable conveyor and its lack of guarding. So, too, could a reasonable person appreciate the dangers posed if the extendable conveyor protruded into the operator area of the Walkie Rider. Mr. Betts knew or should have known of the presence of the movable conveyor ends. And, given his history in the facility and training by DHL, there is every reason to believe that Mr. Betts would realize the danger presented should he drive a moving piece of equipment into it, and that he reasonably should have taken measures to protect himself against doing so.

(Filing No. 169 at 10.) Furthermore,

> The irony is not lost on Walmart that Mr. Betts argues that despite his working at the facility for years he had no knowledge of what he claims is an allegedly dangerous condition. And, further that he makes such a claim while simultaneously arguing Walmart should have knowledge of the same condition despite Walmart not controlling the facility and only sending representatives there perhaps a couple of times per year.

*Id.*

The Court first reiterates some legal principles raised by the parties. "[W]hether a duty exists is a question of law for the court to decide." *Rogers*, 63 N.E.3d at 321.

> Generally, the owner of property is under no duty to provide an independent contractor with a safe place to work, although there is a duty, which extends to employees of independent contractors, to keep the premises in a reasonably safe condition. However, where the instrumentality causing the injury is in the control of the independent contractor, the complainant must show either that the landowner assumed control of the instrumentality or had superior knowledge of the potential

dangers involved in its operation; otherwise, the landowner owes no duty to the contractor's employee.

*Bethlehem Steel*, 661 N.E.2d at 556 (internal citations omitted). Moreover, the Indiana Supreme Court has explained,

> A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land, but only if, he (a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and (b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and (c) fails to exercise reasonable care to protect them against the danger.

*Douglass*, 549 N.E.2d at 370 (internal citation omitted). The Indiana Supreme Court further explained in *Douglass*, "While the comparative knowledge of landowner and invitee is *not* a factor in assessing *whether the duty exists*, it is properly taken into consideration in determining whether such a duty was *breached*." *Id.* (emphasis added). Because the Court concludes that whether a duty exists is determinative in this case, the Court will focus its discussion there.

The designated evidence indicates that DHL was an independent contractor operating the Greenfield Return Center, which was leased by Walmart. "Generally, an owner of property is under no duty to provide an independent contractor with a safe place to work." *Pelak*, 831 N.E.2d at 769. "However, the owner has a duty to maintain the property in a reasonably safe condition for business invitees, including employees of independent contractors." *Id.*

"In premises liability cases, whether a duty is owed depends primarily upon whether the defendant was in control of the premises when the accident occurred." *Rhodes*, 805 N.E.2d at 385. Walmart processed returned merchandise at the Greenfield Return Center; however, Walmart contracted with DHL to receive and process the returns for Walmart. While Walmart directed how much product was received at the Greenfield Return Center, Walmart managed the disposition of returned merchandise through a remote warehouse manager system, and no Walmart employees

were stationed in the Greenfield Return Center.  As an independent contractor, DHL operated the Greenfield Return Center for Walmart.

DHL was responsible for keeping and maintaining the Greenfield Return Center in good condition and repair and in compliance with all laws and regulations. DHL was responsible for making any repairs that were caused by its failure to keep and maintain the facility in good condition and repair. Additionally, DHL was responsible for making any alterations and improvements to the Greenfield Return Center requested by Walmart, including installing all equipment and fixtures requested by Walmart.

DHL also was responsible for providing the necessary management personnel and fully trained crews to operate the Greenfield Return Center.  DHL was responsible for personnel safety matters and was required to operate the Greenfield Return Center in accordance with safety laws and regulations. DHL's general manager at the Greenfield Return Center referred to the facility as a "DHL facility."

Walmart employees came to the Greenfield Return Center only for periodic audits of regulated materials or for facility visits, completing tours of the Greenfield Return Center approximately twice a year. Walmart did not audit DHL for safety-related measures, DHL did not have safety reporting requirements to Walmart, and it was not typical for DHL to report its employees' injuries to Walmart.

Moreover, DHL had safety policies and procedures manuals and an employee handbook for its employees at the Greenfield Return Center. DHL had a safety manager and a safety committee at the Greenfield Return Center. DHL also maintained quality training, maintenance, and operations departments at the Greenfield Return Center.  DHL provided its employees at the

Greenfield Return Center with new hire orientation and safety training, and employees at the Greenfield Return Center had monthly DHL safety meetings.

Mr. Betts' accident at the Greenfield Return Center occurred on March 15, 2017.  DHL management investigated the accident and prepared a DHL summary report of the accident. Following the accident, DHL continued to operate the Greenfield Return Center for more than a year, and on May 4, 2018, DHL ceased operating the facility and turned it over to Walmart for Walmart to directly run the facility.

All of these facts—supported by the designated evidence in the record—point to the conclusion that DHL, not Walmart, exercised control over the Greenfield Return Center when Mr. Betts' accident occurred.  Therefore, a duty on the part of Walmart cannot arise based upon control over the premises generally, so the Court will turn to consideration of control over the injuring instrumentality.

As noted above, "where the instrumentality causing the injury is in the control of the independent contractor, the complainant must show either that the landowner assumed control of the instrumentality or had superior knowledge of the potential dangers involved in its operation; otherwise, the landowner owes no duty to the contractor's employee." *Bethlehem Steel*, 661 N.E.2d at 556 (internal citations omitted).

The Plaintiffs contend that the injuring instrumentality involves the yellow highway guarding, which was in the control of Walmart, not Mr. Betts or DHL. However, the instrumentalities causing Mr. Betts' injury were the walkie rider and the conveyor system.  Mr. Betts struck the extendable portion of the conveyor system while riding on a walkie rider.  His left leg was lacerated and his tibia and fibula were fractured when the inside of his left leg got pinned between the walkie rider and the conveyor system.

As discussed above, DHL was in control of the Greenfield Return Center at the time of Mr. Betts' accident, and DHL managed the day-to-day operations of the facility, including the use of the conveyor system and walkie riders.  While Walmart made the initial purchase of and owned the walkie rider at issue, DHL was responsible for the daily use, operation, and maintenance of the walkie rider at the time of Mr. Betts' accident, and DHL also was responsible for the daily use, operation, and maintenance of the other equipment at the facility (Filing No. 138-14 at 6).  The designated evidence also shows that DHL provided new hire orientation and safety training to its employees and covered topics such as working in confined spaces and avoiding building hazards. DHL provided monthly safety meetings and also provided regular training and certification on using walkie riders.  DHL required its employees to fill out a safety checklist for the walkie rider prior to checking out the walkie rider and operating it during the employee's shift.  Non-operational walkie riders were placed in lock-out, and the DHL maintenance department would try to fix the walkie rider.  If DHL maintenance staff were unable to fix an issue, the maintenance technicians from the manufacturer would be called to do so (Filing No. 138-1 at 12).  The evidence shows that DHL maintained control over the conveyor system and walkie riders. There is no evidence to support the conclusion that Walmart assumed control over the walkie rider and the conveyor system that could support the existence of a duty.

Furthermore, there is nothing in the designated evidence to suggest that Walmart "had superior knowledge of the potential dangers" or that Walmart should have expected that Mr. Betts would fail to protect himself against them.  *See Bethlehem Steel*, 661 N.E.2d at 556; *Douglass*, 549 N.E.2d at 370.  Mr. Betts personally used a walkie rider five to six time a week while working at the Greenfield Return Center for the few years leading up to his accident.  Prior to working at the Greenfield Return Center, Mr. Betts had operated walkie riders for other employers.  Mr. Betts

had been certified and recertified by DHL to operate a walkie rider.  Mr. Betts was given training and instruction regarding the safe operation of walkie riders, including driving cautiously, keeping a proper look out, and looking in the direction of travel.  He also was specifically instructed that he could be pinned or crushed by an object protruding into the operator area of the walkie rider— the very situation he encountered that resulted in his injury. These facts compel the conclusion that "the landowner [Walmart] owes no duty to the [independent] contractor's employee." *Bethlehem Steel*, 661 N.E.2d at 556.

"To recover in negligence, a plaintiff must establish . . . a duty on the part of the defendant." *Schlotman*, 868 N.E.2d at 521. Having failed to do so, Mr. Betts' premises liability negligence claim cannot survive summary judgment. Therefore, the Court **grants** Walmart's Motion on this claim.

As to Mrs. Betts' loss of consortium claim, Walmart asserts,

"[A] cause of action for loss of consortium derives its viability from the validity of the claim of the injured spouse against the wrongdoer." *Arthur v. Arthur*, 296 N.E.2d 788 (Ind. Ct. App. 1972). Under Indiana law, loss of consortium claims, like that asserted by Mrs. Betts, fail as a matter of law where the underlying spouse's claim has been adjudicated and lost. *Bender v. Peay*, 433 N.E.2d 788 (Ind. Ct. App. 1982).

As Mr. Betts's claims fail as a matter of law on summary judgment, so too does Mrs. Betts's wholly derivative claim. Therefore, summary judgment on Mrs. Betts's loss of consortium claim is similarly appropriate.

(Filing No. 137 at 28.) In their response brief, the Plaintiffs acknowledge that "[i]f the spouse's cause of action for personal injury fails, the loss of consortium claim falls with it." (Filing No. 167 at 33.) In light of the Court's determination on Mr. Betts' negligence claim, the Court concludes that Mrs. Betts' loss of consortium claim also must be dismissed by summary judgment.

For the reasons discussed above, Defendant Wal-Mart Stores, Inc.'s Motion for Summary Judgment (Filing No. 136) is **GRANTED**. Plaintiffs LaMarr Betts and Renee Betts' claims are dismissed on summary judgment, the trial and final pretrial conference are hereby **VACATED**, and final judgment will issue under separate order.

   **SO ORDERED.**

Date:  9/24/2021

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

   DISTRIBUTION:

Lee C. Christie
CHRISTIE FARRELL LEE & BELL, P.C.
lee@cflblaw.com

Zachary C. Raibley
FROST BROWN TODD LLC
zraibley@fbtlaw.com

Katherine Anne Franke
CHRISTIE FARRELL LEE & BELL, P.C.
katherine@cflblaw.com

Kevin C. Schiferl
FROST BROWN TODD LLC
kschiferl@fbtlaw.com